## APPEAL OF SOUTHERN MANUFACTURING CO.

Docket No. 4155.   Decided July 20, 1926.

*Claude A. Hope, Esq.*, for the petitioner.
*Ward Loveless, Esq.*, for the Commissioner.

Before MARQUETTE and LOVE.

This appeal is from the determination of a deficiency in income and profits taxes for the year 1920, in the amount of $5,889.55, arising from the disallowance of a deduction of $25,100 claimed by the taxpayer on account of a loss alleged to have been sustained by it in that year.

### FINDINGS OF FACT.

The taxpayer is an Alabama corporation with its principal office at Gadsden, and is engaged in manufacturing lumber and building materials. The capital stock of the corporation was closely held, all of it being owned by members of the Gwin family. For many years prior to April, 1920, H. L. Gwin was secretary, treasurer and general manager of the corporation, and as such he had authority to draw checks against its funds.

On or about February 1, 1920, H. L. Gwin, while on his way to Florida to attend a trade convention, met on the train two men who represented themselves to be George V. Holt and John F. Davis. On account of a washout further along the line, the train was detained for about two days at St. Augustine, Fla. While at St. Augustine, Gwin again met Holt and Davis. They rode about the town, visiting the places of interest, and later went to the room of Holt and Davis to discuss a certain timber deal about which they had spoken to Gwin. This deal, Holt and Davis ex-

plained, consisted of the purchase of a very valuable piece of timber land which they had an option to purchase for $75,000. They exhibited to Gwin certain papers purporting to be said option and a contract for the resale of the property for $150,000, which papers, to Gwin, appeared to be genuine. They also exhibited testimonial letters from banks in New York and Philadelphia and credentials showing membership in certain fraternal orders to which Gwin belonged. They stated to Gwin that the owner of the land would sell only for cash; that they already had $50,000, and if Gwin would contribute the remaining $25,000 the deal could be put through in a few days, and that they would give him one-third of the profit realized on the transaction. Gwin agreed to put $25,000 into the deal, but stated that he would have to go back to Gadsden, Ala., to procure the money. He returned to Gadsden and there drew from the funds of the taxpayer $25,000, by two checks dated February 6, 1920, and payable to cash, one check being for $15,000 and the other for $10,000. On February 2, 1920, he also drew from the taxpayer's funds $100 to cover expenses of the trip referred to.

On his way back from Gadsden to St. Augustine, Gwin stopped at Jacksonville, Fla. At the depot restaurant he met Davis and they took the train to St. Augustine together. On the train Davis showed Gwin his $25,000. At St. Augustine, Holt met Davis and Gwin and the three men went to the Granada Hotel. Holt there informed both Gwin and Davis that he had made arrangements with a St. Augustine bank to get his $25,000 in cash. Thereupon, Davis turned his money over to Holt and Gwin did likewise. No receipt was given to Gwin for his $25,000, nor was a memorandum in writing executed and signed covering the transaction and the participation of each party therein. Holt then stated that he was going down to the bank and that at three o'clock the other parties interested in the transaction would also be there and the deal would be closed. Shortly after Holt left to go to the bank, and while Gwin and Davis were still in the room, someone called over the telephone. Davis answered the telephone and then said to Gwin that it was Holt calling, asking him, Davis, to go down to the bank to identify Holt. Davis left the room but returned shortly and stated that the bank had refused to cash a draft which Holt had for the amount of his contribution to the deal, and that. Holt had gone to Philadelphia to get the money. Davis also stated to Gwin that arrangements had been made to close the deal at the Grand Hotel in Cincinnati, Ohio, and asked Gwin to meet him there the next day. Gwin went to Cincinnati and, after waiting there for several days, discovered that he had been swindled. He thereupon returned to Gadsden.

As soon as he arrived at Gadsden, Gwin called his father and brothers together and told them of his experience with Holt and Davis and of his loss of the $25,000. After a discussion of the whole affair, the family finally said to him, " Well, what are you going to do? " Gwin replied, " I am going to do this; if I find they have swindled me and you have lost the money, I will make it good but I want you to give me time to see if I cannot recover it and find some trace of these men." The family said "All right, that will be all right."

On or about March 2, 1920, T. B. Gwin, the father of H. L. Gwin, without the knowledge of H. L. Gwin, instructed the taxpayer's bookkeeper to transfer to him, T. B. Gwin, as trustee for the benefit of the other stockholders of the taxpayer, a certificate for 80 shares of the capital stock of the taxpayer which belonged to H. L. Gwin and which was kept among various corporate papers. This certificate had some time previously, on the occasion of certain loan transactions with one of the local banks, had been endorsed in blank by H. L. Gwin. The taxpayer's bookkeeper, in accordance with the instructions of T. B. Gwin, wrote above H. L. Gwin's signature the following words—" To T. B. Gwin, Trustee for the benefit of Southern Manufacturing Company." At or about the same time, T. B. Gwin, as president of the taxpayer, requested the local banks not to honor the signature of H. L. Gwin as secretary and treasurer and general manager of the taxpayer. This precipitated the resignation of H. L. Gwin from all of these offices, which resignation became effective immediately. Since then H. L. Gwin has had no connection whatever with the taxpayer.

When H. L. Gwin found out that his certificate for the stock owned by him in the taxpayer had been endorsed to T. B. Gwin as aforesaid, he characterized the endorsement as irregular and not binding upon him. His remark soon came to the knowledge of the family, and thereupon repeated efforts were made by various members thereof to get him to sign some sort of an agreement ratifying the endorsement, which he refused to do. This matter stood until March, 1923. At that time, T. B. Gwin suffered a severe heart attack, which nearly caused his death, and at his insistence H. L. Gwin signed an agreement which had been prepared by direction of T. B. Gwin. This agreement, date March 15, 1923, was as follows:

In order to secure a claim of the SOUTHERN MANUFACTURING COM-PANY, a corporation, in the amount of TWENTY FIVE THOUSAND ONE HUNDRED ($25,100) DOLLARS with interest thereon from February 10th, 1920, and to that end I did agree to turn over to T. B. Gwin eighty (80) shares of the capital stock of said Southern Manufacturing Company owned by me to be held by him as Trustee to secure said claim, I do now hereby ratify said transfer to said T. B. Gwin as such Trustee as security for such claim and the payment thereof, until February 10th, 1926. In the event of

the death of T. B. Gwin, said stock shall be held by A. L. Gwin as such Trustee with the same powers and for the same purposes.

If the said amount and interest thereon from February 10, 1920, is paid at any time prior to said date, said stock shall be restored to the undersigned free from said trust. If said amount is not paid by said date, said stock shall be transferred by my said Trustee to the Southern Manufacturing Company, in settlement of said claim and interest thereon, and said claim of Southern Manufacturing Company shall be thereby entirely settled and I shall have no further claims on said stock, and my said Trustee shall have authority to execute any transfer or sign any papers to carry out this purpose. IN WITNESS WHEREOF I have hereunto set my hand on this day above named.

(Signed)        H. L. Gwin.

Attest A. W. McDougall.

At the time of the transaction herein set forth, H. L. Gwin owned 80 shares of the capital stock of the taxpayer of a value of $200 per share, and a house of a value of about $6,500.

On December 31, 1920, the taxpayer charged off on its books as a loss the amount of $25,100, herein referred to, the following entry being made in connection therewith:

|  | Amount Posted. | | |
| --- | --- | --- | --- |
|  | Detail. | Charges. | Credits. |
| 12/31  Loss and Gain | | | |
| To H. L. Gwin special | | $25, 100.00 | $25, 100.00 |
| ck 2/5/1920 unnumbered on Etawah Tr. & Savings Bank | $10, 000.00 | | |
| ck 2/5/1920 unnumbered on Gadsden National Bank | 15, 000.00 | | |
| These amounts drawn from banks in cash by H. L. Gwin for the alleged purpose of purchasing timber or timber lands somewhere in Fla. without the knowledge or consent of any other official of this company. No detailed or satisfactory accounting of this cash has been made nor has any of the same been returned. No deeds or bills of sale for alleged timber or timber lands have been delivered to this Company. | | | |
| Also ck. #3880 on Etawah Tr. & Sav. Bank dated 2/2/20 for alleged expense on trip for above | 100.00 | | |
| No value received for any of above and the whole is a distinct loss to this Company and H. L. Gwin is no longer connected with this Company on account of said acts. | | | |

The amount of $25,100 so charged off of the taxpayer's books on December 31, 1920, was deducted in computing its net income for the year 1920. The Commissioner, upon audit of the taxpayer's return, disallowed the deduction and determined that there is a deficiency in tax for the year 1920 of $5,889.55.

*The deficiency for the year 1920 is $5,889.55. Order of redetermination will be entered accordingly.*